James Earl **RENAUD** and Kathy Renaud, individually and as parents and next friends of Jennifer Lynn Renaud and Michelle Danniel Renaud, minors; Jack Patterson and Sharon Patterson, individually and as parents and next friends of Shane Patterson, a minor, and heirs-at-law of Hapi Patterson, deceased; Jack Morningstar and Susan Morningstar, individually and as parents and next friends of Craig Allen Morningstar and Kevin Hay Morningstar, minors, and heirs-at-law of Jason Morningstar, deceased; David Clements and Karen Clements, individually and as parents and next friends of Jessica Clements and Sean Clements, minors; William R. Bush, Jr. and Patricia L. Bush, individually and as parents and next friends of Trisha Bush, W. Joseph Bush and Timothy Bush, minors; Ronald Carlisle and Katherine Carlisle, individually and as parents and next friends of Lori Carlisle, a minor; Lawrence Michael Dunlap and Barbara A. Dunlap, individually and as parents and next friends of Shannon Dunlap and Catlin Dunlap, minors; Jerry R. Fitzwater and Toni E. Fitzwater, individually and as parents and next friends of Laura Louise Fitzwater, a minor; John W. Hoesterey and Debra Potter Hoesterey, individually and as parents and next friends of Erin G. Hoesterey and Brooke R. Hoesterey, minors; Alan D. Keiser, Sr. and Evelyn M. Keiser, individually and as parents and next friends of Erin Keiser, Christopher Keiser and Alan D. Keiser, Jr., minors; Roger Marez and Theresa Marez, individually and as parents and next friends of Rory Marez, a minor; Leslie Marez; Sophia Marez; Roger Marez, Jr.; Renee Marez Hernandez; Jeanne Van Note; Barbara Ellen Amelung; Gary Benns and Denise Benns, individually and as parents and next friends of Troy Benns, Bryan Benns and Tiffany Benns, minors, Plaintiffs,

v.

**MARTIN MARIETTA CORPORATION, a Maryland Corporation, and City and County of Denver, Acting Through the Board of Water Commissioners, Defendants.**

Civ. A. No. 87–Z–42.

United States District Court, D. Colorado.

Nov. 9, 1990.

As Amended Nunc Pro Tunc Dec. 13, 1990.

John R. Holland, Law Offices of John Robert Holland, Kathleen Mullen, Law Office of Kathleen Mullen, P.C., Denver, Colo., William S. Finger, Frank & Finger, Evergreen, Colo., and Anthony Roisman, and Michael Hausfeld, Cohen, Milstein, Hausfeld & Toll, Washington, D.C., for plaintiffs.

Daniel S. Hoffman, Daniel J. Dunn, Holme Roberts & Owen, Denver, Colo., for defendant Martin Marietta Corp.

Wayne D. Williams, Michael L. Walker, Henry C. Teigen, Ann R. Avery, Casey S. Funk, Denver Water Dept.; and Robert W. Harris, Chris A. Mattison, Kathleen G. Lanterman, and Jamey W. Jamison, Hall & Evans, Denver, Colo., for defendants City and County of Denver.

J. Greg Whitehair, Asst. U.S. Atty., Denver, Colo., and Judith N. Macaluso, Jane Mahoney, and N. Cornell Boggs, III, U.S. Dept. of Justice, Washington, D.C., for defendant U.S.

## ORDER OF DISMISSAL

WEINSHIENK, District Judge.

The matters before the Court are defendants' motions for summary judgment. An evidentiary hearing was held on these motions from July 9 to July 13, 1990. Jurisdiction is proper pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331. The Court has reviewed the motions, the briefs supporting and opposing the motions, the testimony and exhibits presented at the evidentiary hearing, the opinions submitted by the expert witnesses appointed by the Court pursuant to Fed.R.Evid. 706, and the pertinent case law, and is now prepared to rule.

### I. FACTUAL BACKGROUND

In 1956, the Martin Marietta Corporation (Martin) opened its Waterton facility (Waterton). Martin engaged in the development, testing, and manufacture of Titan missile systems and other aerospace equipment at Waterton. These operations resulted in the production of large quantities of rocket fuel waste products which consisted primarily of hydrazine ($N_2H_4$), monomethyl hydrazine (MMH) and unsymmetrical-dimethyl hydrazine (UDMH) (collec-

tively: hydrazines). The International Agency For Research On Cancer has classified hydrazines as Group 2B carcinogens. This means that it has determined that there is sufficient evidence to conclude that hydrazines are carcinogenic in animals and that it is probable that hydrazines are carcinogenic in humans. The Waterton operations also resulted in the production of other hazardous wastes including trichloroethene (TCE), a solvent, and n-nitrosodimethylamine (NDMA), a bi-product of hydrazine degradation.

Waterton is located uphill and upstream from the Kassler Water Treatment Plant (Kassler), one of the water distribution facilities owned and operated by the City and County of Denver. Brush Creek flows through the Waterton grounds, diverted at certain points in order to aid Martin in its hazardous waste treatment process. It also was one of the primary sources from which Kassler obtained its water. A second primary source from which Kassler obtained its water was alluvial ground water, much of which either originated in or passed through the Waterton property.

In January, 1985, the Colorado Department of Health (CDH) discovered TCE in water being treated at Kassler. Kassler was immediately closed due to toxic contamination and has not reopened.

Between April and June of 1985, the State of Colorado issued two compliance orders to Martin charging that "waste management units at the facility [Waterton] have violated and continue to violate the requirements of the CHWA [Colorado Hazardous Waste Act] and its implementing regulations and that Martin Marietta's management of hazardous wastes at the facility have caused significant contamination of ground water." Exhibit 2 at 2. Similarly, in July, 1985, the Environmental Protection Agency (EPA) issued a cease and desist order to Martin for unpermitted discharges of hydrazine wastewater into Brush Creek from Waterton. In May, 1986, Martin and the State of Colorado entered into a compliance order which required Martin to bring Waterton into compliance with the CHWA and to pay $1 million in civil penalties.

Plaintiffs, all residents of a southwest Denver suburb known as Friendly Hills, allege that they have suffered a variety of injuries which were caused by Martin's improper hazardous waste practices at Waterton. Plaintiffs assert that Martin improperly discharged hydrazines and other hazardous waste into Brush Creek and into the ground water system; that these contaminants infiltrated Kassler water, and that this contaminated water was then distributed to their homes through the City and County of Denver's water distribution system. Plaintiffs allege that this contaminated water caused twelve primary injuries as well as related injuries. Specifically, four of the plaintiffs are children who developed cancer, one of whom developed leukemia; one plaintiff is an adult who suffers from kidney cancer; five plaintiffs are children who allegedly suffer from seizure disorders, and two of the plaintiffs are children with birth defects of the heart.

## II. PROCEDURAL HISTORY

Plaintiffs initiated this action in January, 1987. In their Complaint, plaintiffs have set forth numerous claims sounding in tort as well as one claim based on 42 U.S.C. § 1983. This litigation has been long and arduous. Almost every discovery request was hotly contested. At a hearing held in February, 1990, the Court expressed frustration with the uncooperative tendencies of all parties. The Court also initiated a discussion concerning how to make significant progress in this protracted litigation. Both plaintiffs and defendants were of the opinion that something other than a full trial on all claims and all issues might be desirable, since a full jury trial would probably take between six and nine months to complete. Plaintiffs suggested that a "test" trial, in which a full jury trial would be held on all of the claims of three or four of the plaintiffs, would be most expedient. Defendants suggested that the most efficient way to proceed would be to hold an "issue" trial, in which only evidence concerning causation would be presented to a jury.

After several status conferences and considerable discussion, it was determined that

the most efficient procedure would be to hold a series of summary judgment proceedings. The centerpiece of these proceedings would be an evidentiary summary judgment hearing at which plaintiffs would present their *prima facie* case of causation as if they were presenting the case to the jury at trial. If the Court determined that plaintiffs had met their *prima facie* burden, then the Court would schedule a test trial in which all of the claims of one or two representative plaintiffs would be tried to a jury.

The Court determined that the first of these summary judgment proceedings should address plaintiffs' § 1983 claim. Therefore, defendants filed summary judgment motions in which they sought the dismissal of plaintiffs' § 1983 claim. On April 26, 1990, the Court denied said motions for summary judgment after oral argument.

■ At the April 26 hearing, the Court also granted defendants' motion for court appointed experts. The Court was informed that one of the primary issues of the evidentiary hearing would be the admissibility of plaintiffs' expert witnesses' opinions. A court must make a preliminary determination as to whether the methodology employed by an expert is of a type normally relied upon by experts in that field before the expert's opinion may be presented to a jury. *See* Fed.R.Evid. 703; *Head v. Lithonia Corp., Inc.*, 881 F.2d 941 (10th Cir.1989). This determination necessarily includes an evaluation "pursuant to Rule 104(a) whether particular underlying data is of a kind that is reasonably relied upon by experts in the particular field in reaching conclusions." *Id.* at 944. In order to assist with this evaluation, the Court appointed three expert witnesses: Dr. Hannah F. Pavlik, a geochemist with expertise in chemical hydrogeology; Dr. Daniel M. Perlman, a physician with expertise in environmental health and epidemiology, and Dr. Melville Thomas, a toxicologist.

The Court instructed plaintiffs that their burden at the July evidentiary hearing was to present a *prima facie* case that contaminants reached plaintiffs' taps in quantities sufficient to cause the injuries they have alleged. The Court was to utilize a summary judgment standard in order to determine whether plaintiffs satisfied their burden. The issue was whether a reasonable juror could conclude that contaminants from Martin reached plaintiffs' taps in quantities sufficient to cause the injuries they have alleged. If so, then the motions for summary judgment must be denied. If not, then said motions must be granted. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986). In essence, this standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)...." The threshold inquiry in this case requires much more extensive factual development than has traditionally been permitted in a summary judgment hearing but comports with the Supreme Court's directions for addressing motions for summary judgment. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 250–252, 106 S.Ct. 2505, 2511–2512, 91 L.Ed.2d 202 (1986).

### III. THE EVIDENCE

#### A. Plaintiffs' Prima Facie Case

The evidence plaintiffs presented at the July hearing can be classified in four distinct categories: 1. factual evidence of contamination at Waterton; 2. expert testimony regarding the levels of contamination at Waterton and the proportion of these contaminants that were transported to Kassler (chemical fate and transport testimony); 3. expert testimony regarding the amount of Kassler water that was actually received by Friendly Hills residents and the levels of contaminants that were in this water (water distribution testimony); and 4. expert testimony regarding the probable cause of plaintiffs' primary injuries (medical causation testimony).

#### 1. Factual Evidence of Contamination

Plaintiffs submitted thousands of pages of documents which confirmed the poor hazardous waste management practices at Waterton. They presented the testimony of Dr. Eric Sansone, an expert in industrial hygiene, who testified about numerous unacceptable practices. Plaintiffs also

presented the testimony of Gregory Starkebaum, an investigator at CDH who spearheaded the 1985 Martin investigation. Mr. Starkebaum's testimony included his comments that on every visit he made to Waterton in 1985 and in 1986, he observed improper waste discharges from various locations.

### 2. Chemical Fate and Transport

Plaintiffs' chemical fate and transport evidence was the foundation of their presentation. Plaintiffs presented the testimony of Dr. Lamar Miller, an expert in chemistry and environmental sciences, and Dr. Wayne Huber, an expert in environmental engineering, hydrology and pollution transport. These doctors, along with Dr. Louis Motz, a civil engineer and ground water hydrologist, jointly authored plaintiffs' chemical fate and transport report.

Dr. Miller's primary role in this process was to calculate an initial "load" factor, which quantified the amount of hydrazine contaminants that entered Brush Creek from a wastewater treatment pond at Waterton known as Pond T8–A. Dr. Miller concluded that 100 parts per million (ppm) was an appropriate initial load factor. This factor represents a total concentration of hydrazines and NDMA. Dr. Miller derived this factor from one sample that was taken from the pond in 1985. These contaminants were found in an analysis of this sample in a concentration of 160 ppm. Dr. Miller testified that 100 ppm concentration was a conservative factor to employ in the chemical fate and transport analysis, given the 160 ppm sample. All of the conclusions reached in plaintiffs' chemical fate and transport and water distribution analyses were based on this 100 ppm load factor.

Dr. Miller also addressed the improper waste treatment processes relied on at Waterton. Dr. Miller was of the opinion that there were additional sources of hazardous waste at Waterton other than from Pond T8–A but that these sources were unquantifiable. Plaintiffs continually criticized Martin's almost complete lack of documentation concerning hazardous waste at Waterton and its treatment. Dr. Miller strongly concurred with this criticism.

Dr. Huber testified that it was his opinion that these contaminants reached Kassler in concentrations ranging from 16 to 88 parts per billion (ppb). He explained the chemical transport model he and Dr. Motz constructed and the methods he employed in deriving the decay coefficient. Dr. Huber developed a model in which he attempted to depict the pathway the contaminants traveled from Pond T8–A to Kassler. Through this model, Dr. Huber attempted to calculate the rate at which the contaminants would disintegrate. This involved determining what the applicable "decay coefficient" should be. Dr. Huber relied on the published work of Drs. Arnold Slonim, Jimmy Street and Eckart Schmidt in selecting the decay coefficient for his model. Dr. Huber also concurred with Dr. Miller and stated that there were other contaminant pathways from Waterton to Kassler that the model did not attempt to quantify due to the lack of available data.

### 3. Water Distribution

Plaintiffs submitted the expert report of Dr. Wesley James and Benjamin Harding as evidence that contaminants traveled from Kassler to the plaintiffs' homes in Friendly Hills. It was uncontested that the only periods of time in which contaminants might have reached the plaintiffs' homes were from June, 1977, through December, 1980, and from June, 1982, through February 16, 1983. It was also uncontested that during these periods, Friendly Hills residents never received more than 10 percent of their water from Kassler.

Dr. James testified that, during the exposure periods and assuming that the contaminants concentration at Kassler was either 88 ppb or 16 ppb, contaminants reached Friendly Hills residents in concentrations above 0.0 ppb on 78 percent of the days. Dr. James and Mr. Harding's analysis relies completely on Dr. Huber and Dr. Motz's conclusion that contaminants reached Kassler in concentrations ranging from 16 ppb to 88 ppb.

### 4. Medical Causation

Dr. Bela Toth, a doctor of veterinary medicine with expertise in chemical carcino-

genesis and toxicology, testified that he has been engaged in extensive hydrazine research. It was his opinion, based upon his own research as well as a review of the literature, that hydrazines are highly carcinogenic, as they cause cancer in many different animal species as well as in multiple organs within any given species. Dr. Toth declined to render any opinion as to whether hydrazines are a potential cause of seizure disorders or birth defects. He also declined to render any opinion regarding NDMA or its effects.

Dr. Marvin Legator, an expert in genetic toxicology with emphasis on cancer, teratology and transmissible genetic damage, testified that animal studies have confirmed that hydrazines are among the most potent known carcinogens. He then opined that the plaintiffs' injuries were consistent with known effects of hydrazines and NDMA to a reasonable degree of scientific probability.

Dr. Janette D. Sherman, a physician with expertise in clinical medicine who specializes in workplace and environmental medicine, then testified that plaintiffs' injuries were consistent with hydrazines exposure. She expressed her opinion that there was no other probable cause of plaintiffs' injuries; therefore, the contaminants from Waterton probably caused the alleged injuries. In her analysis, Dr. Sherman presumed exposure to the contaminants. She made this presumption based on the expert report of Dr. James and Mr. Harding as well as that of Drs. Miller, Huber and Motz.

### B. Defendants' Response

The defendants attacked plaintiffs' allegations and expert witness opinions at every juncture. As an initial matter, defendants contended that there was no evidence of contamination at Waterton or Kassler. Defendants asserted that Martin had promulgated extensive standard operating procedures for hazardous waste treatment at Waterton. They argued that there was no evidence supporting plaintiffs' contention that these procedures were not followed.

Defendants then called upon five different expert witnesses to attack the methodology employed by Drs. Miller, Huber, and Motz. These expert witnesses harshly criticized plaintiffs' chemical fate and transport report as follows: 1. It was not scientifically acceptable to base a chemical fate and transport contamination concentration conclusion on only one data point. 2. The sample from which the data point was derived was a sludge sample rather than a liquid sample as plaintiffs asserted. Therefore, the contamination concentrations in that sample were not representative. 3. The decay coefficient Dr. Huber selected was inadequate because it was derived from laboratory experiments that were not applicable to the Brush Creek environment. Furthermore, he failed to differentiate between the four separate chemicals involved in the analysis, and he failed to account for non-laboratory decay mechanisms. 4. The Brush Creek flow rates used in the chemical fate and transport model were not a true representation of the observed flow rate of Brush Creek. 5. The contaminants, if impermissibly discharged, were discharged on an intermittent basis, yet the report concluded that contaminant concentrations of 16 to 88 ppb were constantly in the water arriving at Kassler for the 11-year period the model attempts to depict.

In addition, defendants' expert witnesses criticized several of the techniques relied upon by Dr. James and Mr. Harding in their water distribution analysis.

Defendants also presented a strong rebuttal to plaintiffs' medical causation evidence. Dr. Stephen Sallan, a pediatric oncologist, testified regarding the four cases of cancer in children. Dr. Sallan stated that the four cases were not causally related and that there was no identifiable cause of the cancers. He expressed the opinion that in the absence of such indicia of causation, the only means of determining causation is by epidemiological studies.

Drs. Daniel Goldstein and Daniel Teitelbaum, physicians with expertise in toxicology, both testified that the methods employed by plaintiffs' medical causation experts were not scientifically acceptable and that there was no evidence on which to base a causation conclusion in this case. Dr. Steven Piantadosi, a physician with expertise in oncology, biostatistics and epide-

miology, then testified that he had conducted an epidemiological study on the difference of cancer in children in Friendly Hills. It was Dr. Piantadosi's conclusion that the difference between the expected and observed incidence rates was not statistically significant. In other words, it was Dr. Piantadosi's opinion that four cases of childhood cancer was within the expected range for the Friendly Hills community.

Plaintiffs presented the testimony of Dr. David Ozonoff, a public health physician with expertise in environmental medicine, public health, and epidemiology, and of Dr. Richard Clapp, an epidemiologist, who discussed Dr. Piantadosi's findings and conclusions. Dr. Ozonoff testified that it is difficult, if not impossible, to perform a meaningful community based epidemiological study in a small community like Friendly Hills. He also opined that since it was clear that Friendly Hills residents were exposed to the hydrazines contaminants, Dr. Piantadosi's finding that the childhood cancer incidence rate in Friendly Hills was approximately twice what one would expect is significant. Dr. Clapp also testified that the finding that the rate was twice what was expected is significant even if a statistician would not conclude it is significant.

## IV. DISCUSSION

### A. Applicable Legal Standards

In order to resolve the pending motions for summary judgment, the Court must determine whether a reasonable juror could conclude that contaminants from Martin reached plaintiffs' taps in quantities sufficient to cause the alleged injuries. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Because it is a drastic remedy, defendants must establish beyond a reasonable doubt that they are entitled to summary judgment. *See Florom v. Elliott Mfg.*, 867 F.2d 570, 574 (10th Cir.1989).

All of the claims plaintiffs assert sound in tort. In order to prevail on a tort claim, a plaintiff must prove by a preponderance of the evidence that a defendant committed an act which caused an injury to that plaintiff. "Under Colorado law, an event is the proximate cause of another's [injury] if in the natural and probable sequence of things, it produced the claimed injury. It is an event without which the injury would not have occurred." *In Re Swine Flu Immunization Products Liability*, 495 F.Supp. 1188, 1206 (D.Colo.1980). *See also Kaiser Foundation Health Plan v. Sharp*, 741 P.2d 714, 719 (Colo.1987). In order to prove causation in the toxic tort setting, plaintiffs must prove that defendants caused plaintiffs' exposure to toxic contamination and that the exposure caused, or contributed to, plaintiffs' injuries. *See Brafford v. Susquehanna Corp.*, 586 F.Supp. 14, 17–18 (D.Colo.1984). Therefore, in order to establish a causal connection between the contamination at Waterton and plaintiffs' injuries, it was necessary to show facts and circumstances which indicated with a reasonable probability that the injuries resulted from, or were caused by, the Waterton contamination. *See In Re Swine Flu*, 495 F.Supp. at 1206.

Certain issues were clearly established at the hearing. Despite defendants' assertions to the contrary, the evidence was overwhelming that there was massive contamination at Waterton. The evidence of observed discharges and the discovery of TCE in the Kassler water supply constituted ample evidence that Martin's hazardous waste standard operating procedures were not followed, its hazardous waste treatment system was mechanically flawed, or some combination of both. The existence of plaintiffs' injuries, other than the alleged seizure disorders, was uncontested. However, proof that Martin committed reprehensible acts coupled with evidence of injury is not enough to prevail on a tort claim. Plaintiffs must prove that the reprehensible acts caused, or increased the likelihood of, the alleged injuries.

There were two ways plaintiffs could have established their *prima facie* case of causation. First, plaintiffs could have shown that contaminants traveled from Waterton to Friendly Hills and that plaintiffs were exposed to these contaminants at levels sufficient to cause the alleged inju-

ries. A second method of proof would have been for plaintiffs to have shown that the injuries in Friendly Hills were such that it was probable that there was exposure to the contaminants at levels sufficient to cause the alleged injuries. Plaintiffs relied primarily on the former.

The focus of the remaining portion of this opinion will be on the sufficiency of the evidence plaintiffs presented and the methodologies employed by plaintiffs' expert witnesses. If these expert witnesses based their conclusions on underlying data not normally relied upon by other experts in their particular disciplines, then those conclusions will not be considered in evaluating the sufficiency of plaintiffs' evidence because evidence of such conclusions may not be presented to a jury. *See Head v. Lithonia*, 881 F.2d 941, 944 (10th Cir.1989).

### B. The Single Data Point Controversy

Plaintiffs submitted the expert reports of Drs. Miller, Huber and Motz and Dr. James and Mr. Harding which, when read together, postulate that hydrazine waste water containing a constant concentration of hydrazines and NDMA of 100 ppm was discharged into Brush Creek on a regular basis over an 11 year period. Further, the reports concluded that these toxins traveled from Pond T8–A at Waterton to Kassler and arrived at Kassler in concentrations ranging from 16 to 88 ppb, and that the contaminants were frequently delivered in measurable quantities to Friendly Hills residents.

■ Expert witnesses testifying on behalf of defendants attacked many of the methodological techniques employed by the authors of these expert reports. Most of these alleged methodological flaws, however, must be considered by a jury when evaluating the weight to be given to the opinions, rather than by the Court in making the preliminary assessment concerning the admissibility of a given opinion. *See, e.g., Allen v. United States*, 588 F.Supp. 247, 413 (D.Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988). For example, defendants strongly criticized the factors Dr. Huber considered and failed to consider

when deriving the decay coefficient. Defendants' expert witnesses opined that among other factors, no reasonable expert would fail to account for chemical volatilization when deriving a decay coefficient. Asserting that he did account for chemical volatilization, Dr. Huber expressed his opinion that this effect would be negligible. Therefore, he did not factor this effect into the derivation of the decay coefficient. In deriving the decay coefficient, Dr. Huber determined what factors contributed to the contaminants' decay coefficient and then attempted to calculate the effect the identified factors would have on the contaminants' rate of decay. The issues of which factors should have been considered and what impact each should have been given in deriving a decay coefficient are issues to be resolved by a jury.

One alleged flaw does not raise the factual question of what weight an opinion should be given but instead raises the legal issue of whether any weight whatsoever may be accorded the opinion. That flaw is plaintiffs' reliance upon a single data point in formulating their scientific conclusion. All of plaintiffs' evidence of exposure rests upon this data point because it is the starting point for plaintiffs' expert witnesses' analyses. If the data point is removed, the expert witnesses have no basis on which to reach any conclusion other than that it was possible that the plaintiffs were exposed to these contaminants.

■ As an initial matter, defendants contest plaintiffs' assumption that the sample was a liquid sample taken from Pond T8–A. Defendants maintain that the sample was a sludge sample taken from the floor of Pond T8–A. If the sample was of sludge, then the concentration of measured contaminants would be much greater than the concentration of any contaminated wastewater that was discharged. The factual determination of whether the sample was taken from liquid or sludge is one for a jury.

The dispute, however, is illustrative of the danger of relying upon only one sample to formulate conclusions about what the "normal" contaminants concentration of Pond T8–A was during the 11–year expo-

sure period. The dispute illuminates one potential source of sampling error. Simply put, no one has any idea of whether this sample is representative of the "normal" contaminants concentration. Dr. Hannah Pavlik, the Court-appointed expert witness in geochemistry and hydrogeology, wrote in her report to the Court that "[i]t is unsound scientific practice to select one concentration measured at a single location and point in time and apply it to describe continuous releases of contaminants over an 11–year period." Expert Report submitted by Dr. Pavlik at 6.

■ Plaintiffs argued that defendants may not fail to keep proper records and then assert that plaintiffs' *prima facie* case must fail due to a lack of data. Plaintiffs relied on the cases of *Elam v. Alcolac, Inc.*, 765 S.W.2d 42 (Mo.Ct.App.W.D. 1988), *cert. denied*, —— U.S. ——, 110 S.Ct. 69, 107 L.Ed.2d 36 (U.S.Sup.Ct.1989), and *Allen v. United States*, 588 F.Supp. 247 (D.Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988), in support of their assertion that quantification of the exposure level is not required under these circumstances. In both *Elam* and *Allen*, however, the courts did not hold that the absence of data permits the inference that there was an exposure. In those cases, the courts found ample circumstantial evidence of exposure and then refused to require precise quantification of the level of exposure. In contrast, the direct evidence in this case is insufficient to support the contention that it is probable that there was an exposure. Plaintiffs' chemical fate and transport and water distribution evidence, when viewed in its best light, proves at most that there was a possibility that plaintiffs were exposed to contaminants from Waterton. Mere possibilities or conjecture cannot establish a probability. *See In Re Swine Flu*, 495 F.Supp. at 1206; *O'Connor v. Boulder Colorado Sanitarium Ass'n.*, 107 Colo. 290, 111 P.2d 633, 634–35 (1941). Therefore, the Court concludes that no reasonable juror could find, based on these expert opinions, that it was probable that plaintiffs were exposed to the Waterton contaminants.

## C.  Medical Causation and the Epidemiology Controversy

Plaintiffs contend that if defendants prevail on their argument that plaintiffs cannot prove their case because of insufficient data, then plaintiffs have no means of meeting their required burdens and defendants become the beneficiaries of their own impermissible failure to maintain proper records. This contention is unfounded. Even in the absence of direct evidence, plaintiffs in toxic tort cases can present circumstantial evidence in order to show that it is probable that they were exposed to contaminants. The two primary forms of circumstantial evidence in a toxic tort case are etiological evidence and epidemiological evidence. For example, plaintiffs could have attempted to show that their injuries exhibited lesions or other indications that hydrazines or NDMA were a potential cause of the injuries. Plaintiffs also could have attempted to show that there was an abnormally high incidence rate of the injuries they have alleged in Friendly Hills compared to other similarly situated communities. Although not required, such evidence might support an inference that it was probable that they were exposed to Waterton contaminants.

Plaintiffs made no attempt to present such circumstantial evidence on the exposure issue, however. Instead, plaintiffs relied upon their chemical fate and transport and water distribution reports as direct evidence of exposure. Plaintiffs' medical causation expert witnesses all presumed the exposure and testified that plaintiffs' injuries were consistent with such an exposure. Dr. Toth discussed animal study experiments which revealed that hydrazines are highly carcinogenic in many species and in many organs within a species. Drs. Sherman and Ozonoff testified that plaintiffs' broad array of injuries could all have been caused by Waterton contaminants, in essence because hydrazines have the alleged ability to cause almost any cancer or birth defect in a human being. Plaintiffs presented no evidence that the etiology of any of their injuries revealed that hydrazines caused those injuries. Instead, plaintiffs submitted evidence in the form of

expert witness opinion that hydrazine causation of their injuries is not inconsistent with the known etiology of their injuries. This evidence, however, does not assist plaintiffs in their effort to prove that they were exposed to Waterton contaminants. It is useful only after plaintiffs have met their burden on the exposure issue by some other means.

■ One other potential means of proving an exposure is by epidemiological studies. The parties were strongly divided in their views regarding the necessity for corroborative epidemiological evidence in a toxic tort case. This argument focused not on the utility of epidemiological evidence as circumstantial evidence of exposure but on whether epidemiological evidence was required to show that the Waterton contaminants have the ability to cause plaintiffs' injuries.

Plaintiffs asserted that epidemiological studies are not required as proof in order to establish a contaminant-injury, cause-effect relationship in a toxic tort case. *See, e.g., Christophersen v. Allied–Signal Corporation,* 902 F.2d 362 (5th Cir.1990); *Donlan v. Indian Head Cranberries,* No. 87–866 (Massachusetts Superior Court February 26, 1990) (order denying a motion for summary judgment). Defendants contended that such evidence is necessary. *See, e.g., Wilson v. Merrell Dow Pharmaceuticals, Inc.,* 893 F.2d 1149, 1154 (10th Cir. 1990); *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, 313 (5th Cir.), *modified,* 884 F.2d 166 (5th Cir.), *reh'g en banc denied,* 884 F.2d 167 (5th Cir.1989). The cases plaintiffs cite all involve various individuals' claims that they were exposed to a toxin that caused their alleged injuries. These alleged exposures were only of an individual and not of an identifiable group or community. In such an instance, it is impossible to submit corroborative epidemiological evidence because it is impossible to identify a group or community which has been exposed to the alleged carcinogen, and an epidemiological study therefore cannot be conducted. The cases defendants cite involve a known exposure of an entire community to an alleged carcinogen. In those cases, the courts found plaintiffs' causation evidence insufficient because

they were unable to submit epidemiological proof of the alleged cause-effect relationship. All of the cases cited, when read together, support an approach to toxic tort cases that requires submission of epidemiological evidence to establish causation in cases where collection of such evidence is possible. Collection of such evidence is possible in situations where an identifiable exposure population is large enough to perform a meaningful epidemiological study.

In this case, even if plaintiffs had been able to prove exposure by their direct evidence, they would have been required to submit epidemiological evidence in support of their causation contentions. Such a submission would have been necessary because this is a case where it is alleged that an entire community has been exposed to the contaminants. Under these circumstances, it is possible to perform an epidemiological study. Therefore, such evidence should have been submitted; otherwise, plaintiffs fail to meet their causation burdens. *See, e.g., Wilson,* 893 F.2d at 1154.

The Court, however, will not base the ultimate resolution of these motions for summary judgment on this ground. Drs. Ozonoff and Clapp, while assessing Dr. Piantadosi's epidemiological study, asserted that the Friendly Hills community was not large enough to perform a meaningful epidemiological study. They asserted, in effect, that this case is much more akin to the cases in which only individuals have been exposed than to the cases in which an identifiable population has been exposed. In such cases, a court should not require submission of epidemiological evidence.

The problem with this argument, even if the Court accepts it, is that it eliminates the plaintiffs' ability to submit circumstantial evidence that the injury incidence rates in Friendly Hills are abnormally high. This, in effect, eliminates the only other means available that plaintiffs have to prove exposure. Dr. Clapp attempted to overcome this by opining that Dr. Piantadosi's finding that the number of childhood cancers in Friendly Hills is approximately twice what one would expect is significant. This opinion does not assist plaintiffs in

their effort to prove that the other eight primary injuries they have experienced are causally related to Waterton contaminants.

Plaintiffs allege that the Waterton contaminants caused four childhood cancers. According to Dr. Piantadosi, while the expected number of childhood cancers in Friendly Hills was approximately two, four cases of childhood cancers is not outside of the expected range for the number of childhood cancers for that community. Some communities with the demographics of Friendly Hills will have no cases of childhood cancers, some will have one, some will have two, some will have three, some will have four, and so on. Dr. Ozonoff testified that in order to be considered statistically significant in this situation, Friendly Hills would have had to experience an eight-fold increase in its childhood cancer incidence rate. He testified that he believed this standard to be too strict. However, the Fifth Circuit, when addressing a similar argument, stated that "we find ... the Brocks' failure to present *statistically significant* epidemiological proof that Bendectin causes limb reduction defects to be fatal to their case." *Brock*, 884 F.2d at 167 (emphasis added). The Fifth Circuit then went on to encourage district judges faced with similar issues to be "especially vigilant in scrutinizing the basis, reasoning, and *statistical significance* of studies presented by both sides." *Id.* (emphasis added).

In any case, plaintiffs primarily argued that Dr. Piantadosi's study was not conclusive on this issue. Plaintiffs did not attempt to perform an epidemiological study of their own because plaintiffs viewed such a study as futile. Friendly Hills, in the opinion of Drs. Ozonoff and Clapp, was too small in population to yield meaningful results in an epidemiological study under these circumstances. Plaintiffs did not attempt to rely on epidemiological evidence as circumstantial evidence of exposure. Therefore, as Dr. Daniel Perlman corroborated in his expert report, there is no epidemiological evidence which can be considered as a basis for satisfying plaintiffs' *prima facie* burden in this case. *See* Expert Report submitted by Dr. Perlman at 9.

## V. CONCLUSION

Plaintiffs' burden at the evidentiary summary judgment hearing was to present a *prima facie* case of causation. In order to accomplish this, they had an obligation to show that they were exposed to Waterton contaminants at levels sufficient to cause the injuries they have alleged. Plaintiffs' direct evidence of exposure proved only that it was possible that they were exposed. They submitted virtually no circumstantial evidence of exposure. Their evidence was insufficient to meet their *prima facie* burden. No reasonable juror could conclude that it was probable that plaintiffs were exposed to Waterton contaminants. Therefore, the Court will grant defendants' motions for summary judgment and dismiss this action. Accordingly, it is

ORDERED that defendants' motions for summary judgment are granted. It is

FURTHER ORDERED that the Complaint and cause of action are dismissed with prejudice, the parties to pay their own costs and attorneys' fees. It is

FURTHER ORDERED that all other pending motions are moot.